IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL WAYNE PATTERSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:16-CV-204-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated March 28, 2016, this case has been transferred for the conduct of all further proceedings and the entry of judgment. (doc. 13.)  Before the Court is *Plaintiff's Brief in Support of Plaintiff's Appeal of Denial of Claim for Social Security*, filed March 30, 2016 (doc. 15); *Defendant's Response Brief*, filed April 29, 2016 (doc. 16); and *Plaintiff's Brief in Response to Defendant's Brief*, filed May 2, 2016 (doc. 17).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND[1]

### A.   Procedural History

Michael Wayne Patterson (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying his claim for disability and disability insurance benefits (DIB) under Title II of the Social Security Act.  On January 24, 2014, he applied for disability and DIB, alleging disability beginning February 23, 2011.  (R. at 216-17.)  His claim

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  At the time of the initial filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

was initially denied on March 24, 2014, and upon reconsideration on July 10, 2014. (R. at 145-46, 151-53.) On July 14, 2014, he requested a hearing before an administrative law judge (ALJ). (R. at 154-55.) He appeared and testified at a hearing on October 5, 2015. (R. at 29-71.) The ALJ denied Plaintiff's applications on November 10, 2015, finding him not disabled. (R. at 24.) Plaintiff timely appealed the ALJ's decision to the Appeals Council, and the Appeals Council adopted the ALJ's decision on January 14, 2016. (R. at 1-4, 9.) Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

**B.     Factual History**

**1.     Age, Education, and Work Experience**

Plaintiff was born on May 2, 1959, and was 56 years old at the time of the hearing before the ALJ. (R. at 23, 32.) He graduated from high school and had past relevant work as a an industrial cleaner. (R. at 23.)

**2.     Medical Evidence**

On August 5, 2011, Plaintiff presented to the Parkland Memorial Hospital (Parkland) emergency room with a chief complaint of hemorrhoids, which he had reportedly experienced for "some time." (R. at 418.) Plaintiff also reported that he had rectal surgery for hemorrhoids in 2005. (*Id.*) After a physical examination, Plaintiff was treated for constipation and prescribed Anusol for his hemorrhoids. (R. at 419.) He returned to the emergency room on February 17, 2012, with a chief complaint of dental pain and cough. (R. at 420-21.) Plaintiff's physical examination revealed mild palpable tenderness of the gum and tooth loss without vestibular tenderness. (R. at 422.) He was fully oriented, had full range of motion and a normal mood, affect, and behavior, and his judgment and thought content were also normal. (*Id.*) Plaintiff was diagnosed with a toothache,

2

gingiva disorder, acute upper respiratory infection of an unspecified site, acute pharyngitis, unspecified disorder of the teeth and supporting strictures, and unspecified gingival and periodontal disease. (R. at 424.)  He was prescribed Amoxicillin, Benzonatate, Atarax, and Naproxen; given dental resources; and discharged that day. (R. at 423.)

On May 25, 2012, Plaintiff was admitted to Parkland's emergency room with a chief complaint of headache and abdominal pain. (R. at 429-30.)  He described his abdominal pain as intermittent and occurring twice a month. (R. at 635.)  Plaintiff's physical examination was normal, and a posterioranterior and lateral chest x-ray showed no significant radiographic abnormality. (R. at 432, 596.)  He was prescribed Hydrocodone-Acetaminophen as needed and Ranitidine, and discharged home that day. (R. at 432, 439.)

Plaintiff returned to Parkland's emergency room on June 27, 2012, with a chief complaint of abdominal pain. (R. at 446-47.)  His physical examination was normal. (R. at 448.)  He was started on Amlodipine and referred to his primary care physician for blood pressure management and a colonoscopy. (R. at 449.) He returned on June 31, 2012, with a chief complaint of a headache and breast pain. (R. at 454-55.)  Plaintiff described the pain as "dull." (R. at 643.)  He was prescribed Tramadol and instructed to follow up with his primary care physician. (R. at 457.)

On December 31, 2012, Plaintiff had a psychiatric diagnostic interview exam with Patricia Newton, M.D., at Metrocare Services (Metrocare). (R. at 348.)  Plaintiff reported that he began to hear voices and suffer from paranoid delusions in 1984, and he had been paranoid to some degree ever since. (R. at 349.)  The voices were not bothersome, but that he had tactile and visual hallucinations that "irritate[d]" him considerably. (*Id.*)  He also had mood swings, he was bipolar and somewhat euphoric, his mind jumped from topic to topic, and he showed poor judgment. (*Id.*)

He also suffered from depression and slept poorly.  (*Id.*)  Dr. Newton noted that Plaintiff had used illegal drugs (marijuana and cocaine) and alcohol from the 1980s until 1996. (*Id.*)  She diagnosed chronic paranoid psychosis with bipolar mood disturbance.  (R. at 351.)

Plaintiff began counseling sessions with Christopher Keener, LPC, at Metrocare, on January 7, 2013.  Mr. Keener noted that Plaintiff seemed positive and upbeat, he engaged well, and his goal was to find employment.  (R. at 354.)  He continued to have regular sessions with Mr. Keener until October 7, 2013.  (R. at 354, 362, 369, 373, 375, 382, 383, 390, 394, 403.)  During that time, Mr. Keener regularly reported that Plaintiff was appropriately dressed, his thoughts were organized, his mood was good or euthymic, and he was fully oriented.  (R. at 362, 366, 373, 379.)  On March 25, 2013, Plaintiff stated that he was "fine" and denied anxiety, nervousness, racing thoughts, mood swings, agitation, anger, crying spells, restlessness, depressive symptoms, difficulty concentrating, insomnia, anhedonia, auditory or visual hallucinations, or suicidal or homicidal thoughts.  (R. at 367.)  On May 6, 2013, Plaintiff stated he did not go to church, like his family wanted, because he was "too lazy."  (R. at 373.)  He was also having problems with his job search because of his criminal record.  (*Id.*)  During his counseling sessions with Mr. Kenner, Plaintiff also reported no problems eating or sleeping.  (R. at 362, 375, 379, 383.)  On August 22, 2013, Plaintiff reported to Mr. Kenner that his "goal" was to obtain SSI and then save money to get a place of his own.  (R. at 390.)  At his last appointment with Mr. Kenner on October 7, 2013, Plaintiff told the counselor that everything in his life was stable, and that he would wait until one year after filing his appeal for SSI before he would begin trying to work.  (R. at 403.)

On February 13, 2013, Plaintiff met with Humaira Moten, M.D., at Parkland to establish care.  (R. at 467.)  Dr. Moten noted that Plaintiff had been diagnosed with gastroesophageal reflux

disease (GERD) and depression.  (R. at 467.)

On March 21, 2013, Plaintiff was admitted to Parkland's emergency room with for dental pain and pharyngitis.  (R. at 472.)  A physical examination revealed tooth decay.  (R. at 473.)  He described the pain as moderate with a severity of 8/10.  (R. at 648.)  Plaintiff was prescribed Arnoxil and Loratadine, and referred to a dentist.  (R. at 474.)  He returned to the emergency room for "a check up" on June 10, 2013. (R. at 483.)  He reported a history of bilateral hand and foot pain, a toothache, and chronic abdominal pain, but no pain was present during his "check up."  (*Id.*)  His abdominal pain was relieved with over-the-counter Zantac.  (*Id.*)  He was negative for myalgia, back pain, and joint pain.  (R. at 483, 485.)  A psychiatric review for Plaintiff was normal.  (R. at 486.)  He was prescribed Naproxen, referred to his primary care physician, and discharged.  (*Id.*)

On December 10, 2013, Plaintiff returned to Parkland's emergency room for a medication refill.  (R. at 659.)  He reported no other complaints and denied any chest pain, dyspnea, palpitations, or abdominal pain.  (*Id.*)  Plaintiff was negative for any neck and back pain.  (R. at 660.)

On December 27, 2013, Plaintiff met with Dr. Newton at Metrocare.  (R. at 413.)  She noted that Plaintiff had a "few" symptoms and occasionally heard voices, but he was satisfied with how he felt.  (*Id.*)  His bipolar symptoms were manageable on the current medications, and he did not want to change his medications.  (R. at 414.)  He had follow ups with Metrocare every few months until November 24, 2014.  (R. at 413, 514, 522, 567, 573, 578, 581, 585, 588, 726.)

On February 17, 2014, Plaintiff presented to Parkland's emergency room with nasal congestion and headaches.  (R. at 508.)  He reported recurrent headaches in the frontal region, which he described as a sharp, moderate pain.  (R. at 509.)  His physical examination revealed a normal range of motion.  (R. at 510.)  He was discharged the same day.  (R. at 507.)

On March 18, 2014, medical consultant Patty Rowley, M.D., completed a case analysis and found that Plaintiff's physical impairments were non-severe. (R. at 121.) On July 8, 2014, medical consultant Kelvin Samaratunga, M.D., found that Plaintiff's physical impairments were non-severe, and that he had no significant functional limitations. (R. at 134-34.)

On March 20, 2014, Matthew Turner, Ph.D., considered Plaintiff's mental impairments and the paragraphs B and C criteria. (R. at 121-22.) Dr. Turner found that Plaintiff's affective disorder moderately affected his activities of daily living, maintenance of social functioning, and his concentration, persistence, and pace. (R. at 122.) He opined that Plaintiff was able to understand, remember, and carry out detailed but non-complex instructions, make important decisions, attend and concentrate for extended periods, interact with others, accept instructions and respond to changes in work settings. (R. at 125.) On July 7, 2014, Susan Thompson, M.D., opined that Plaintiff retained the ability to understand, remember and carry out simple instructions, make simple decisions, concentrate for extended periods, and interact with others as well as respond to changes in the work setting. (R. at 138.) He was capable of simple and repetitive tasks. (*Id.*)

On April 17, 2014, Plaintiff went to Parkland for a follow up on his GERD, hypertension, and seasonal allergies. (R. at 527.) He reported no complaints regarding his hypertension or issues associated with his GERD. (*Id.*) He also reported having back pain for several years but no trauma or other symptoms related to back pain. (*Id.*) He had a normal range of motion, was fully oriented, and had a normal mood and affect. (R. at 529.) Plaintiff's Zantac prescription was discontinued and he was started on Protonix. (R. at 530.) He was also prescribed a low sodium diet. (*Id.*)

On June 11, 2014, Plaintiff had a consultative physical examination with Thomas Pfeil, M.D. (R. at 535.) He reported hand and foot pain, low back pain, headaches, abdominal pain, and

hypertension. (*Id.*) Plaintiff also reported that his low back pain began in 2010, but denied radiation of the symptom, attending physical therapy, or using pain-relieving medication. (*Id.*) He took medication for high blood pressure, which was 148/87 at the examination. (R. at 535-36.) Dr. Pfeil noted that Plaintiff was alert, fully oriented, and cooperative, and that his memory and concentration were good. (R. at 536.) He found no tenderness of the cervical or lumbar spine, a normal gait with no unsteadiness, a full range of motion in all joints (including the lumbar spine with not evidence of tenderness or inflamation), and the ability to stand on toes and heels. (R. at 537-38.) Imaging of Plaintiff's left hand noted minimal degenerative hypertrophy and a small cyst. (R. at 540.) Imaging of the lumbar spine revealed spondylolisthesis, mild degenerative spondylosis from L3 to L5, severe degenerative facet joint hypertrophy, and moderate degenerative joint hypertrophy at L2 to S1. (*Id.*) Dr. Pfeil opined that Plaintiff was limited in bending and stooping repetitively, lifting and carrying more than 20 to 30 pounds, and sitting, standing, or walking more than one hour without changing position. (R. at 537-38.) He opined that Plaintiff's maximum range of motion for his back was a 25 degree extension and 90 degree flexion, and that he had a lateral (flexion) of 25 degrees on the left and right. (R. at 542.)

Arthur W. Joyce, Ph.D., completed an interview and mental status evaluation for Plaintiff on June 17, 2014, whose chief complaint was "Not able to work because Schizophrenia and hearing voices and things." (R. at 546.) He gave vague reports regarding the usefulness of his treatment at Metrocare. (*Id.*) Plaintiff had been hospitalized at Green Oaks for 24 hours in 2012, because the "voices got worse" and he "was feeling bad." (*Id.*) His symptoms included hearing voices, feeling sad and nervous, and poor sleep. (*Id.*) Plaintiff was cooperative but mildly restless, demonstrated a paranoid thought process, experienced daily auditory command hallucinations, was fully oriented,

and had problems with accurately encoding information and deficient memory. (R. at 548.) He had

a coherent, logical, and goal-directed thought process, a negative and dysphoric mood, issues with

concentration, and poor judgment and insight. (*Id.*) Dr. Joyce's prognosis was guarded. (R. at 549.)

On June 17, 2014, Plaintiff was admitted to Parkland with a chief complaint of seasonal

allergic rhinitis and chronic nasal congestion. (R. at 564.) He had a CT maxillofacial exam without

contrast. (R. at 552, 561-63, 596.) It showed minimal mucosal thickening involving the left

maxillary sinus and periodontal disease, and he was discharged home. (R. at 552, 564.) On July 31,

2014, Plaintiff had a follow-up appointment at Parkland for his hypertension, back pain, and GERD.

(R. at 670.) He reported no complaints and denied any side effects of his medication. (*Id.*)

On September 8, 2014, Dr. Newton completed a Medical Assessment of Ability to Do Work-

Related Activities (Mental) for Plaintiff. (R. at 554.) She noted that he suffered from appetite and

sleep disturbances, paranoia, low energy, chronic disturbance of mood, psychomotor

agitation/retardation, difficulty thinking/confusion, racing thoughts, chronic depression,

hallucinations/delusions, and anger outbursts. (R. at 555.) Dr. Newton diagnosed schizoaffective

disorder and alcohol and cannabis dependance, and she assessed a GAF score of 50. (R. at 555.)

She opined that Plaintiff had some loss of his ability to maintain his personal appearance and

substantial loss of his ability apply commonsense understanding to carry out detailed but uninvolved

written or oral instructions, maintain attention/stay on task for an extended period, ask simple

questions or request assistance, and cope with normal work stress without exacerbating

pathologically based symptoms in regular competitive employment. (R. at 554-55.) She further

opined that he had extreme loss of ability to perform the following activities in regular, competitive

employment and in a sheltered work setting: apply commonsense understanding to carry out simple

one or two-step instructions, demonstrate reliability by maintaining regular attendance and being punctual within customary tolerances, maintain concentration for an extended period, perform at a consistent pace without an unreasonable number and length of rest period/breaks, act appropriately with the general public, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, behave in an emotionally stable manner, respond appropriately to changes in a routine work setting, and finish a normal work week without interruption from psychologically-based symptoms.  (*Id.*)

On November 12, 2014, Plaintiff had a colonoscopy at Parkland.  (R. at 597-98, 672.)  His exam was normal except for a benign-appearing pedunculated polyp in his rectum, which was removed.  (R. at 597-98.)

Plaintiff returned to Parkland on December 17, 2014, for headaches and arthritis.  (R. at 678.)  It was noted that Tylenol PM "correct[ed]" Plaintiff's insomnia, and that Pantoprazole controlled his GERD.  (*Id.*)  Plaintiff was fully oriented and had normal range of motion, reflexes, and mood and affect.  (R. at 680.)

Plaintiff went to Parkland's emergency room on February 19, 2015, with a chief complaint of daily headaches.  (R. at 681-82.)  He described the headaches as a dull, gradual pain in the front of his head, which had occurred since 2010.  (R. at 682.)  A CT brain without contrast was ordered and conducted later that day.  (R. at 599, 681.)  Plaintiff's brain and ventricles were normal in appearance without evidence of mass, hemorrhage, hydrocephalus, or other lesions, and no acute intracranial abnormalities were identified.  (R. at 599.)

On April 21, 2015, Plaintiff returned to Parkland with a complaint of tingling and headaches.

(R. at 686.)  He reported a sticking/burning sensation in both feet and hands that had not improved with prior medication.  (*Id.*)  He also reported a remote history of lower back injury and that his GERD was controlled with Pantoprazole.  (*Id.*)  Plaintiff's hypertension problem was controlled. (R. at 686.)   His active problems were listed as chest pain, nocturia, tension headaches, hypertension, seasonal allergic rhinitis, GERD, and depression.  (R. at 686-87.)  Plaintiff was prescribed Gabapentin for his hand and foot numbness.  (R. at 688.)

On July 20, 2015, Plaintiff reported to Parkland's emergency room with a chief complaint of chest pain.  (R. at 689.)  He reported that chest pain was from his abdominal pain ascending that morning after his breakfast.  (*Id.*)  He had a posterioranterior and lateral chest x-ray, which found no significant abnormalities.  (R. at 600.)  His pain resolved and he was discharged.  (R. at 692.) On September 15, 2015, Plaintiff had a follow up appointment at Parkland.  (R. at 693-94.)  He denied chest pain but reported anxiety and occasional nervousness.  (R. at 694.)  He was directed to schedule an optometry appointment, continue his medication, take Tylenol for arthritis as needed, and buy Claritin, Benadryl, or Zyrtec for his allergies.  (R. at 696.)

### 3.      Hearing Testimony[3]

On October 5, 2015, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 29-71.)  Plaintiff was represented by an attorney.  (R. at 31.)

#### a.      *Plaintiff's Testimony*

Plaintiff testified that he was 5' 9" tall, weighed 180 pounds, and was right-handed.  (R. at 35.)  He graduated from high school, but neither attended college nor had any special vocational

---

[3] Plaintiff also had a hearing before a different ALJ on July 23, 2012 related to claims for disability and DIB under Title II and SSI under Title XVI filed on February 23, 2011.  (R. at 72-102.)  Those claims were denied on September 19, 2012.  (R. at 106-117.) In reaching her decision in the pending matter, the ALJ noted that the earlier denial was upheld on appeal and that the doctrine of *res judicata* applied for the period prior to the ALJ's decisions.  (R. at 14.)

training.  (R. at 36.)  He lived with his mother, and she paid any of his bills that were not covered by food stamps.  (R. at 35, 37.)  Plaintiff's driver's license was suspended in 1996 for drugs, and he never successfully had it reinstated.  (R. at 35-36.)  He had served in the National Guard for two or three years and was discharged sometime in the 1970s.  (R. at 36.)

Plaintiff previously worked as a custodian for nine years.  (R. at 39.)  His duties included cleaning, mopping, taking out trash, buffing floors, vacuuming, and running a scrub machine.  (R. at 40.)  He carried heavy items ranging from 20 to 40 pounds and pushed items heavier than 50 pounds on a dolly.  (R. at 40-41.)  He did not have problems following his supervisor's directions, but he did not like his coworkers telling him to do things.  (R. at 63-64.)  He committed a crime, i.e., making a false statement, was given probation, and was terminated.  (R. at 38-39.)  Plaintiff had not attempted to seek employment since 2010.  (R. at 37-39.)  He did, however, receive unemployment benefits in 2011.  (*Id.*)

Plaintiff's lower back hurt when he lifted things.  (R. at 42.)  He did not take any medication for it.  (R. at 44-45.)  He could pick up a gallon of milk but felt "a little pain" when he did so.  (R. at 44.)  He had high blood pressure, which caused dizziness and headaches.  (R. at 47.)  His headaches began in 2010 or 2011 and had lasted for a day on average.  (R. at 43.)  They could last for the entire week, however.  (*Id.*)  When he experienced a headache, it would make him not want to do anything.  (R. at 44.)  Plaintiff took Amlodipine for his high blood pressure.  (R. at 46.)

Plaintiff also experienced acid reflux.  (R. at 47.)  It caused him to stop breathing and experience chest pain, which lasted all day .  (R. at 47-48.)  When it flared up, he had to stop for a few minutes before he could begin working again.  (R. at 49.)  He took Ranitidine for it.  (R. at 47.)  Plaintiff also suffered from depression, which made him nervous around loud noises.  (R. at 50-51.)

He did not like being around people.  (*Id.*)  Plaintiff sought treatment at Metrocare for his depression, which helped "[a] little bit," and he took Celexa.  (R. at 49, 53.)

On a typical day, Plaintiff got up, ate breakfast, went outside for a walk, and watched TV all day.  (R. at 53-54.)  He was able to bathe and dress himself.  (R. at 55-56.)  He only walked for approximately one block because he did not like being around dogs or people, and usually carried a club with him.  (R. at 54, 58.)  He was able to pay attention when he watched TV, but his memory was not good.  (R. at 55.)  His mother handled his food stamps, but he went with her to the store occasionally.  (R. at 56.)  He did not go to the mall, movies, or out with friends.  (R. at 51.)

Plaintiff sometimes heard voices that told him to kill himself and other people.  (R. at 57.)  He also received messages through his TV at least several times a week.  (R. at 57-58, 64.)  He could stand about 20 to 30 minutes before he needed to sit down and normally slept only one to two hours per night.  (R. at 58-59.)  Plaintiff thought he could perform a light job, including standing, walking, and light lifting.  (R. at 61.)

### b.    *VE's Testimony*

The VE testified that Plaintiff had past work as an industrial cleaner (381.687-018, medium, SVP: 2).  (R. at 66.)

The ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and vocational background who was able to perform work at a medium exertional level.  (*Id.*)  The hypothetical person could frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, or crawl.  (R. at 66-67.)  He also needed to avoid concentrated exposure to unprotected heights or machinery with moving parts.  (R. at 67.)  He could understand, remember, and carry out simple instructions; perform simple, routine tasks; and make

12

simple work-related decisions.  (*Id.*)  The hypothetical person could have frequent contact with supervisors, occasional contact with coworkers, and occasional contact with the public.  (*Id.*)  The ALJ then asked whether the hypothetical person could perform any of Plaintiff's past work.  (*Id.*) The VE responded that he could.  (*Id.*)

The ALJ also asked whether there was any alternative unskilled work that the hypothetical person could perform.  (*Id.*)  The VE responded that the hypothetical person could also be a dishwasher (318.687-010, medium, SVP: 2) with 125,000 positions nationally and 7,200 in Texas; laundry worker (361.684-014, medium, SVP: 2) with 21,600 positions nationally and 1,100 in Texas; and automobile detailer (915.687-034, medium, SVP: 2) with 15,800 positions nationally and 860 in Texas.  (*Id.*)  The ALJ then asked the VE to consider the same hypothetical but assume the individual had to change positions after one hour of sitting or standing.  (*Id.*)  The VE responded that there would not be a sit/stand option in any position at the medium level.  (R. at 68.)

The ALJ next asked the VE to consider the same hypothetical person but at a light exertional level, who could frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, or crawl; and frequently handle and finger bilaterally.  (*Id.*) Additionally, he would need to avoid concentrated exposure to unprotected heights or machinery with moving parts.  (*Id.*)  He could understand, remember, and carry out simple instructions; perform simple, routine tasks; make simple work-related decision; have frequent contact with supervisors; occasional contact with coworkers; and occasional contact with the public.  (*Id.*)  The ALJ then asked whether the hypothetical person could perform any of Plaintiff's past work.  (*Id.*) The VE responded that he could not, but that he could be a routing clerk (222.687-022, light, SVP: 2) with 28,200 positions nationally and 1,200 in Texas; photo copy machine operator (207.685-014, light,

SVP: 2) with 17,200 positions nationally and 1,600 in Texas; and sorter (222.687-014, light, SVP: 2) with 12,500 positions nationally and 790 in Texas.  (R. at 68-69.)

The ALJ then asked the VE to consider the same hypothetical person, but that he was required to miss four days or more each month due to pain or other symptoms as a result of the individual's impairment.  (R. at 69.)  The ALJ asked the VE whether he could perform any jobs in the regional or national economy.  (*Id.*)  The VE responded that he could not.  (*Id.*)  The ALJ then asked the VE to assume that the hypothetical person needed to change positions after one hour of sitting and standing.  (R. at 70.)  She asked whether the hypothetical person could perform Plaintiff's past work, and the VE responded that he could not.  (*Id.*)  The ALJ then asked if there were other jobs he could perform.  (*Id.*)  The VE responded that he could still be a routing clerk, photo copy machine operator, or sorter.  (*Id.*)  The VE stated that her testimony was consistent the Dictionary of Occupational Titles (DOT).  (R. at 69.)

## C.    The ALJ's Findings

The ALJ issued her decision denying benefits on November 10, 2015.  (R. at 14-24.)  At step one,[4] she found that Plaintiff had not engaged in substantial gainful activity since February 23, 2011, the alleged onset date.  (R. at 16.)  At step two, she found that he had the severe impairments of affective disorder, degenerative disc disease of the lumbar spine, and high blood pressure.  (*Id.*)  Despite the impairments, at step three, she found that he had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (R. at 17.)

Next, the ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform

---

[4]  The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described below.

medium work as defined by 20 CFR 404.1567(c) and assessed that he could lift and carry up to 50 pounds occasionally and 15 pounds occasionally, stand and/or walk up to six hours in an eight-hour workday and sit up to six hours in an eight-hour workday.  (R. at 18.)  He could also frequently climb ramps or stairs and occasionally climb ladders, ropes, or scaffolds, and frequently stoop, kneel, crouch, or crawl.  (*Id.*)  Plaintiff should avoid concentrated exposure to workplace hazards such as unprotected heights or machinery with moving parts.  (*Id.*)  He could understand, remember, and carry out simple instructions, perform simple routine tasks, and make simple work-related decisions.  (*Id.*)  Plaintiff could tolerate frequent contact with supervisors, and occasional contact with coworkers and the public.  (*Id.*)

At step four, the ALJ found that Plaintiff could perform his past relevant work as an industrial cleaner.  (R. at 23.)  Although he was capable of performing his past relevant work, the ALJ also found that there were other jobs that he could perform.  (*Id.*)  At step five, the ALJ found that Plaintiff could perform work as a dishwasher, laundry worker, and auto detailer.  (R. at 24.)  In the alternative, the ALJ concluded that he was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  (*Id.*)  Therefore, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since February 23, 2011, the date of protective filing.  (*Id.*)

## II. LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient

for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.   A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.   *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).   Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436 & n.1.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

     The Commissioner utilizes a sequential five-step analysis to determine whether a claimant

is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the

burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates

if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment

available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d

at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of

the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES

Plaintiff raises four issues for review:

1.   The ALJ failed to apply the appropriate legal standard established by the Fifth Circuit Court of Appeals in deciding which of Plaintiff's impairments are severe at Step 2 of the Sequential Analysis.

2.   The ALJ's PRFC is fatally flawed in that it is not based on substantial evidence.

3.   The ALJ failed to follow *SSR 96-6p* in determining that the State Agency Medical Consultant's opinions and Medical Experts' opinions were invalid.

4.   The ALJ erred in failing to apply the Grid Rules to determine that Plaintiff is disabled.

(doc. 15 at 1.)

## A.   <u>Severity Standard</u>

Plaintiff argues that the ALJ applied an improper standard to evaluate his severe impairments at step two in violation of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir 1985). (doc. 15 at 10.)

### 1.   *Stone*

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not

18

severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone*, 752 F.2d at 1101, 1104-05. Accordingly, to meet the severity threshold at step two, "the claimant need only . . . make a *de minimis* showing that [his] impairment is severe enough to interfere with her ability to do work." *Anthony* , 954 F.2d at 294 n.5 (citation omitted). "Because a determination [of] whether an impairment[ ] is severe requires an assessment of the functionally limiting effects of an impairment[ ], [all] symptom-related limitations and restrictions must be considered at this step." SSR 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, in identifying Plaintiff's severe impairments, the ALJ cited to 20 CFR 404.1520(c).[5] (R. at 16.) She stated that "[a] medically determinable impairment or combination of impairments is 'severe' within the meaning of Social Security Act and Regulations if it *significantly* limits an individual's physical or mental ability to do basic work activities." (*Id.*) (emphasis added) (citing to 20 C.F.R. § 404.1521). The ALJ further stated that "[a]n impairment or combination of

---

[5] Under 20 CFR 404.1520 for evaluation of disability in general:

> You must have a severe impairment. If you do not have any impairment or combination of impairments which *significantly limits* your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.

20 CFR 404.1520(c) (emphasis added).

impairments is deemed 'not severe' when it is no more than a slight abnormality which has *such a minimal effect on* the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." (*Id.*) (emphasis added). The ALJ did not cite to *Stone*. (*See* R. at 14-24.)

*Stone* provides no allowance for a minimal interference with a claimant's ability to work. *Stone*, 752 F.2d at 1104. Given the difference between these two constructions and the ALJ's failure to cite to *Stone*, she applied an incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 404.1520(c) that the ALJ cited in this case); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb.6, 2013) (noting "while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard").

### 2.    *Harmless Error*

Even where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required where the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's (or its symptoms) effects on the claimant's ability to work at those steps. *See, e.g., Herrera*, 406 F. App'x at 3 & n.2; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases). An ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments (i.e., *Stone* error) "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [ ] where the ALJ proceeds past step two in the sequential

20

evaluation process." *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *accord Newbauer v. Colvin*, No. 3:14-CV-3548-BH, 2016 WL 1090665, at *15 (N.D. Tex. Mar. 21, 2016) (applying harmless error analysis); *see also Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* in finding at step two that the claimant's alleged mental impairment was non-severe). Accordingly, Plaintiff must show that the ALJ's step two error was not harmless. *See Garcia v. Astrue*, No. CIV. M-08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error."). In the Fifth Circuit, harmless error exists when it is "inconceivable" that a different administrative determination would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Plaintiff argues that the *Stone* error was not harmless because "the ALJ could have found that [Plaintiff] had additional severe impairments at the step 2 finding, and consequently found [him] disabled." (doc. 15 at 14.) These medical impairments include GERD; chronic headaches, due to either allergic rhinitis or elevated blood pressure; dental pain; hypertension; abdominal pain; anemia; hemorrhoids; occasional joint pain, maybe due to and arthritis; low back pain due to degenerative disc disease; hand and foot pain, with no clear etiology, but may be caused by peripheral neuropathy due to hypertension; chest pain; and schizophrenia. (*Id.* at 11-12.) If she had classified these impairments as severe, "the ALJ would have had to determine the impact of the impairments on [his] RFC." (*Id.* at 12.)

21

At step two, the ALJ determined that Plaintiff's severe impairments were affective disorder, degenerative disc disease of the lumbar spine, and high blood pressure.  (*See* R. at 16.)  Because none of his impairments or a combination of impairments met or medically equaled a listed impairment at step three, the ALJ proceeded to assess RFC.  (*See* R. at 17); *see also* 20 C.F.R. § 404.1520a(d)(3); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.").  Consideration of all "medically determinable impairments . . . including [those] that are not 'severe,'" and "all of the relevant medical and other evidence," is required by the regulations when determining RFC.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 85–28, 1985 WL 56856, at *3.

The ALJ followed a two-step process.  (R. at 19.)  First, she determined whether there was an underlying medically determinable physical or mental impairment, or combination thereof, that could reasonably be expected to produce Plaintiff's pain or other symptoms.  (*Id.*)  She found that his medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (R. at 22.)  Second, she evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limited his functioning.  (*Id.*)

In determining Plaintiff's RFC, the ALJ found that Plaintiff could perform medium work as defined by 20 CFR 404.1567(c) and that he could lift and carry up to 50 pounds occasionally and 15 pounds occasionally, stand and/or walk up to six hours in an eight-hour workday and sit up to six hours in an eight-hour workday.  (R. at 18.)  Plaintiff could also frequently climb ramps or stairs and occasionally climb ladders, ropes, or scaffolds, and frequently stoop, kneel, crouch, or crawl.  (*Id.*)  He should avoid concentrated exposure to workplace hazards such as unprotected heights or

22

machinery with moving parts. (*Id.*) He could understand, remember, and carry out simple instructions, perform simple routine tasks, and make simple work-related decisions, and tolerate frequent contact with supervisors, and occasional contact with coworkers and the public. (*Id.*)

The ALJ acknowledged Plaintiff's testimony, the medical evaluations by the different doctors, and the results of diagnostic tests and x-rays. (R. at 18-22.) She considered the results of imagining scans and repeated physical examinations in relation to the opinions of Drs. Newton, Pfeil, and Joyce.[6] (*See id.*) ("While imaging revealed some degenerative changes, which would likely reduce the claimant to medium work, the lack of other objective findings does not support greater limitations."). She noted that Dr. Pfeil did not specify the reason or clinical finding for requiring Plaintiff to change position hourly and did not adopt that portion of his opinion, even though the findings of a consultative examiner are generally accorded great weight and she adopted many of his findings. (R. at 20.) The ALJ also considered it important that repeated physical examinations failed to document any abnormal musculoskeletal findings, such as tenderness or limited range of motion, and that he was not prescribed and did not take any pain relieving medications. (*Id.*) She concluded that "[t]he medium RFC and other limitations therein take into account claimant's degenerative condition of his lumbar spine as well as his high blood pressure." (*Id.*)

As noted, the ALJ's RFC assessment should be based on all of the relevant evidence in the record and should account for all of the claimant's impairments, *including those that are non-severe*. *See* 20 C.F.R. § 404.1545(a)(3). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular

---

[6] She also noted that Plaintiff previously received an unfavorable ALJ decision on September 19, 2012 that was considered final and binding through the day of the decision. (R. at 19.)

and continuing basis." 20 C.F.R. §§ 404.1545(b)-(c), 416.945(b)-(c);SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *accord Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 (2002) and SSR 96-8p (1996)] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.'"). SSR 96-8p distinguished between what the ALJ must consider and what the ALJ must include in her written decision. Here, the ALJ's narrative discussion shows she applied the correct legal standards and considered all of the relevant evidence in determining Plaintiff's RFC.

Additionally, even if Plaintiff is correct that use the *Stone* standard would have resulted in a determination that he also had the severe medical impairments of (1) GERD; (2) chronic headaches, due to either allergic rhinitis or elevated blood pressure; (3) dental pain; (4) hypertension; (5) abdominal pain; (6) anemia; (7) hemorrhoids; (8) occasional joint pain, maybe due to and arthritis; (9) low back pain due to degenerative disc disease; (10) hand and foot pain, with no clear etiology, but may be caused by peripheral neuropathy due to hypertension; (11) chest pain; and (12) schizophrenia, the ALJ nevertheless considered the symptoms of these impairments in her RFC assessment. *See* 20 C.F.R. § 404.1545(a)(3) (noting the ALJ's RFC assessment should be based on *all* of the relevant evidence in the record and should account for all of the claimant's impairments, including those that are non-severe).

At steps four, the ALJ concluded that Plaintiff was capable of performing his past relevant work as an industrial cleaner because it did not require the performance of work-related activities precluded by his RFC and he was able to perform it as it was actually and generally performed. (R. at 23.) He therefore was found by the ALJ to not be disabled. (R. at 23-24.) The ALJ's disability decision shows that she considered Plaintiff's alleged pain, medical impairments and limitations,

and the diagnoses of his doctors.  (*See* R. at 18-22.)  To the extent that the ALJ rejected a diagnosed impairment, as the trier of fact, she was entitled to do so if she found it was not supported by the objective medical evidence.  *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] . . . to resolve.").  At step two, it was still Plaintiff's burden to prove he had an impairment or combination of impairments that rendered him "incapable of engaging in any substantial gainful activity."  *See Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986); *see also Fraga*, 810 F.2d at 1301.  A "physical" or "mental" impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In determining Plaintiff's severe limitations at step two and RFC, the ALJ expressly relied on physical examinations, diagnostic findings, and all of the evidence in the medical record.  (*See* R. at 14-24.)

In conclusion, the ALJ's *Stone* error was harmless because it is inconceivable that she would have assessed a different RFC—and thereby reached a different disability determination—if she had applied the *Stone* severity standard at step two.  *See Taylor*, 706 F.3d at 603 (finding that the ALJ's failure to cite to *Stone* at step two was harmless, and "remand [was] not required since there [was] no evidence in the record that [the claimant's] mental health claims [were] severe enough to prevent him from holding substantial gainful employment" at step five); *Goodman v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-1321-G-BH, 2012 WL 4473136, at *10 (N.D. Tex. Sept. 10, 2012) (*Stone* error was harmless where the ALJ considered the effects of the claimant's mental impairments, including those that were not severe, on his ability to work at step four), *adopted by* 2012 WL 4479253 (N.D. Tex. Sept. 28, 2012).  Remand is therefore not required on this ground.

25

**B.**      **RFC**

Plaintiff contends that the ALJ's physical RFC assessment was not supported by substantial

evidence.  (doc. 15 at 14-19.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined

"medical assessment of an applicant's impairments with descriptions by physicians, the applicant,

or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378,

1386-87 (5th Cir. 1988) (per curiam). The relevant policy interpretation states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained
> work-related physical and mental activities in a work setting on a regular and
> continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days
> a week, or an equivalent work schedule.
>
> 2. The RFC assessment considers only functional limitations and restrictions that
> result from an individual's medically determinable impairment or combination of
> impairments, including the impact of any related symptoms.

SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The ALJ "is responsible for assessing

the medical evidence and determining the claimant's residual functional capacity."  *Perez v.

Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the

case record, including opinions submitted by treating physicians or other acceptable medical

sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  Every medical

opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight

to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's

"physician, psychologist, or other acceptable medical source" who provides or has provided a

claimant with medical treatment or evaluation, and who has or has had an ongoing treatment

relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.* § 404.1527(c)(2).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings."  *Id.* (citations omitted).  Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.  *See Johnson*, 864 F.2d at 343 (citations omitted).

Plaintiff argues that the ALJ improperly relied on her own lay opinion to determine the

effects of his impairments in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995).[7] (docs. 15 at 15; 17 at 5.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion.  67 F.3d 552.  The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete.  *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision.  *Id.*  The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work.  *Id.*  The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician.  *Id.* at 557-58.  Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts.  *Id.* at 558 n.27.

After making a credibility analysis, the ALJ considered the medical evidence and opinions in the medical record.  (*See* R. at 18-22.)  She noted that she generally gave the opinions of consultative examiners great weight, but affirmatively did not adopt the part of Dr. Pfeil's

---

[7] Plaintiff also relies on *Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112 (E.D. Tex. Feb. 27, 2003) and *Pree v. Colvin*, No. 3:11-CV-3538-M, 2013 WL 5184016 (N.D. Tex. Sept. 13, 2013) in his opening brief.  (*See* doc. 15 at 15). Both *Browning* and *Pree* consider an ALJ's improper reliance on his or her own lay opinion in light of the Fifth Circuit's *Ripley* opinion, *see Browning*, 2003 WL 1831112, at *6-7; *Pree*, 2013 WL 5184016, *16 n.14, which was identified in Plaintiff's reply brief, (*see* doc. 17 at 5).

assessment that required Plaintiff to change his position hourly and limited his carrying capacity in light of the clinical findings.  (R. at 20.)  She noted inconsistencies in Dr. Joyce's consultative psychological examination in light of Metrocare's medical records.  (R. at 21) (noting that "[i]f the claimant's symptoms and signs were as severe as reported by [Dr. Joyce], examiners at MetroCare would have likely noted such findings and adjusted medication over their course of treatment of claimant," which they did not).

Next, the ALJ considered the medical opinions of the state agency's medical consultants, including Drs. Samaratunga and Thompson.  (R. at 22.)  She gave Dr. Samaratunga's finding that Plaintiff had no physical impairments that were severe "little weight" because imaging studies supported the finding that spondylosis would limit Plaintiff to medium work.  (R. at 22.)  The ALJ then gave "great weight" to Dr. Thompson's mental RFC assessment, which found that Plaintiff was limited to simple instructions and decisions with a capacity to perform simple and repetitive tasks, because it was consistent with the medical records from Metrocare.  (*Id.*)  Finally, she considered the medical assessment from Dr. Newton, which was given "little weight" because it was "wholly contradicted" by concurrent treatment records from the same day.  (*Id.*)  Because the RFC was based on specific medical opinions, the ALJ did not rely on her own lay opinion in violation of *Ripley*.

## C.    SAMC Opinions

Plaintiff contends that the ALJ committed legal error by not following SSR 96-6p in rejecting some of Dr. Pfeil's opinion medical opinions.  (doc. 15 at 17.)

State agency medical consultants (SAMCs) are considered experts in Social Security disability determination, and their opinions may be entitled to great weight if they are supported by the evidence.  *Hardin v. Astrue*, No. 3:10-CV-1343-B, 2011 WL 1630902, at *7 (N.D. Tex. Mar.

31, 2011), *adopted by* 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011).   Although the ALJ is solely

responsible for assessing the claimant's RFC, he must consider any opinion by an SAMC in making

this assessment.   SSR 96-6p, 1996 WL 374180, at *4 (S.S.A. July 2, 1996).   "RFC assessments by

[SAMCs] . . . are to be considered and addressed in the [ALJ's] decision as medical opinions from

nonexamining sources about what the individual can still do despite his or her impairment(s)" and

"are to be evaluated considering all of the factors . . . for considering opinion evidence" outlined in

20 C.F.R. § 404.1527(c).   *Id.*   The ALJ is not required to expressly discuss each finding by an

SAMC or discuss each factor listed in 20 C.F.R. § 404.1527(c),[8] however, because such a detailed

analysis applies only to the ALJ's rejection of a treating sources' uncontradicted opinion.   *See*

*Newton*, 209 F.3d at 456-58.   The ALJ also "must explain the weight given to these opinions in [her]

decision[ ]." SSR 96-6p, 1996 WL 374180, at *4.

Here, the ALJ referred to Dr. Pfeil by name.   (R. at 20.)   She specifically considered his

observations and conclusions, affirmatively did not adopt the part of his assessment that required

Plaintiff to change his position hourly and limited his carrying capacity in light of the clinical

findings, and explicitly assigned a weight to his opinions.   (R. at 20.)[9]   She did not commit legal

---

[8]  The factors include: (1) whether the relationship was examining or not, (2) nature and extent of treatment relationship, (3) supportability of the medical opinion, (4) consistency, (5) specialization of the physician, and (6) other factors.  *See* 20 C.F.R. § 404.1527(c)(2) (listing factors to consider)

[9]  In making this finding, she stated:

> While limitations to bending and stooping repetitively are adopted based on Dr. Pfeil's opinions, the limitation to carry only 20 to 30 pounds is not supported by full range of motion, normal gait, and otherwise unremarkable clinical findings. . . . Repeated physical examination failed to document any abnormal musculoskeletal findings such as tenderness or limited range of motion. More recently, the claimant noted ongoing low back pain, but he denied radiating symptoms. He did not report taking or being prescribed any pain relieving medication. . . . The medium RFC and other limitations therein take into account the claimant's degenerative conditions of his lumbar spine as well as his high blood pressure.

(*Id.*)

30

error.  *See* SSR 96-6p, 1996 WL 374180, at *4; *see Hunt v. Astrue*, No. 4:12-CV-244-Y, 2013 WL 2392880, at *7 (N.D. Tex. June 3, 2013) ("The ALJ is not required to discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation."); *compare Webb v. Astrue*, No. 408-CV-747-Y, 2010 WL 1644898, at *11 (N.D. Tex. Mar. 2, 2010) (holding that "the ALJ erred by not . . . specifying the weight he assigned to each [SAMC] opinion"), *adopted by* 2010 WL 1644697 (N.D. Tex. Apr.  22, 2010); *Jones v. Colvin*, No. 3:13-CV-0097-BH, 2014 WL 1281288, at *8-10 (N.D. Tex. Mar. 31, 2014) (finding that an ALJ committed legal error where the he failed to assign a specific weight to SAMC's opinion).

**D.**     <u>**Grid Rules**</u>

Plaintiff contends that the ALJ erred by failing to apply Grid Rule 202.04 at step five to determine that he was disabled.  (doc. 15 at 19.)

To be considered disabled, a claimant must have a severe impairment that makes him unable to perform his previous work or any other substantial gainful activity existing in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a).  According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [his] physical or mental abilities and vocational qualifications."  20 C.F.R. § 404.1566(b).  It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy.  20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding.  *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (per curiam) (citing *Fraga*, 810 F.2d at 1302).

31

To establish that work exists for a claimant at step five of the sequential disability determination process, the ALJ relies on the testimony of a VE in response to a hypothetical question[10] or other similar evidence, or on the Medical–Vocational Guidelines promulgated to guide this determination, often referred to as "the Grids."[11]   *Newton*, 209 F.3d at 458; *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008).   An ALJ may rely exclusively on the Grids if the impairments are solely exertional,[12] or if the nonexertional impairments do not sufficiently or significantly[13] affect the RFC.   *Newton*, 209 F.3d at 458 (citing *Fraga*, 810 F.2d at 1304 (stating that when "the claimant either suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the Guidelines in determining whether there is other work

---

[10]  "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.' "   *Benton ex rel. Benton v. Astrue*, No. 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).  A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question.   *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994) (per curiam).  If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of proof to show that despite an impairment, a claimant could perform available work.   *Boyd*, 239 F.3d at 708.

[11]  The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors.   *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[12]  Under the Social Security regulations, impairments are either exertional or nonexertional.   Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs.  The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (i.e., sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  All other impairments are classified as nonexertional.   *See Holiday v. Barnhart*, 460 F. Supp. 2d 790, 806 (S.D. Tex. 2006) (citing *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000) and 20 C.F.R. § 404.1569(a)); *see also* SSR 96-9P, 1996 WL 374185, at *5 ("[A] nonexertional limitation is an *impairment-caused* limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional." (emphasis in original)).

[13]  *Compare Newton*, 209 F.3d at 458 (the nonexertional impairments "do not *sufficiently*" affect the RFC) (emphasis added), *with Selders*, 914 F.2d at 619 (the nonexertional impairments "do not *significantly*" affect the RFC) (emphasis added); *Fraga*, 810 F.2d at 1304 (same).

available that the claimant can perform")).  If the claimant suffers from nonexertional impairments, or a combination of exertional and nonexertional impairments, then the ALJ must rely on the testimony of a VE or other similar evidence to establish that such jobs exist in the economy.  *Id.* The Grids explicitly state that they "do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional impairments."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1).

Even when the claimant is so affected by a nonexertional impairment as to preclude resort to the Grids, they "may nevertheless be consulted as a 'framework' for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations."  *Moore v. Social Sec. Admin.*, 153 F. App'x 945, 947 (5th Cir. 2005) (per curiam) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2) (2005)). When using the Grids as a framework, the agency's regulation and rulings state that when a claimant has a combination of exertional and nonexertional limitations and the exertional limitation directs a finding of "disabled," then "there is no need to consider the additional effects of a nonexertional impairment."  SSR 83-14, 1983 WL 31254 at *3; 20 C.F.R. Pt. 404, Subpt. P., App. 2, § 200.00(e)(2); *see also Rodriguez v. Barnhart*, No. CIV. SA05CA1203–FB, 2006 WL 3779777, at *2 (W.D. Tex. Nov. 6, 2006).  "If the applicable rule directs a finding that plaintiff is not disabled, [however,] the Commissioner [must] consider nonexertional limitations and utilize the testimony of a vocational expert." *Rodriguez*, 2006 WL 3779777, at *2; *accord Gonzalez v. Astrue*, No. M-09-210, 2013 WL 1345298, at *9 n.14 (S.D. Tex. Mar. 29, 2013) (observing that courts and legal scholars have noted that "[h]ow, exactly, the grids provide . . . a framework is unclear . . . [but] one thing is clear: Where the claimant's characteristics do not coincide exactly with a Grid Rule, the ALJ

should introduce expert vocational testimony to further assist him in his Grids framework guided analysis.") (citations and internal quotation marks omitted).

Here, Plaintiff argues that because he cannot perform work at the *medium* exertional level, he meets the criteria of Grid Rule 202.04 and must be found disabled.  (doc. 15 at 20.)  Grid Rule 202.04 applies to a claimant limited to work at less than the medium exertional level.  *See Solis v. Colvin*, No. H-12-1848, 2013 WL 12106139, at *5 (S.D. Tex. May 22, 2013) (applying 20 C.F.R. Part 404, Subpt. P, App. 2, Rule 202.04), *adopted by* 2013 WL 12107660 (S.D. Tex. June 11, 2013). The ALJ's medium RFC finding is supported by substantial evidence, however.  The Grid Rules therefore do not dictate a finding of disabled in this case.  *See, e.g., Solis*, 2013 WL 12106139, at *5 (finding that Grid Rule 202.04 did not apply because the court previously found that the ALJ's medium RFC finding supported by substantial evidence).

## IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 30th day of March, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE